UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


JASON  Z.,[1]

          **Plaintiff,**                        **Case No. 2:25-cv-1841**
                                              **Magistrate Judge Cheryl L. Pollak**

    v.

**FRANK BISIGNANO,**
**Commissioner of Social Security,**

          **Defendant.**


## OPINION AND ORDER

        This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Jason Z. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Plaintiff appeals from the final decision of the Commissioner of Social Security denying Plaintiff's application.[2] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Frank Bisignano, the Commissioner of Social Security, is substituted as Defendant in his official capacity.

1

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security income on January 25, 2022, and January 27, 2022, respectively, alleging that he had been disabled since December 10, 2021. R. 275, 352–53, 372–73, 512–33, 536–39. Plaintiff's applications were denied initially on June 15, 2022, and upon reconsideration on November 10, 2022.  R. 275, 398–437. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").  R. 275, 438–39. ALJ Ellen Bush held a hearing on August 30, 2023, at which Plaintiff, who was represented by counsel, appeared and testified, as did a vocational expert, Joseph Young. R. 275, 298–351. In a decision dated March 5, 2024, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from December 10, 2021, the alleged onset date, through March 5, 2024, the date of that decision. R. 276–90. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on January 15, 2025. R. 1-6.  Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 30, 2025, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 10.[3] On April 20, 2026, the case was reassigned to the undersigned. ECF No. 18. The matter is now ripe for disposition.

## II.  LEGAL STANDARD

### A.  Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

---

[3]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

3

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121

4

("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation

omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See, e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.      Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§

6

404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

III.    **ALJ DECISION AND APPELLATE ISSUES**

Plaintiff was 46 years old on the alleged onset date, and 48 years old as of the date of the hearing. R. 282, 289. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2023. R. 278. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between December 10, 2021, his alleged onset date, and the date of the decision. *Id*.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: major depressive disorder, generalized anxiety disorder, posttraumatic stress disorder, attention deficit hyperactivity disorder, and right flexor carpi radialis tendon tear that "significantly limit the ability to perform basic work activities as required by SSR 85-28." R. 278.  The ALJ also

7

found that the following diagnosed impairments - gastric ulcers, kidney disease, adrenal cancer, hypertension, dyslipidemia, vitamin D deficiency, obesity, and hernias - were "non-severe" and did "not cause more than minimal functional limitations in his ability to perform basic work activities. . . ." *Id*. 278-79.  In assessing the Plaintiff's RFC, the ALJ stated that he considered all of Plaintiff's medically determinable impairments, including those that were not severe. *Id.*

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 280–82.   In so finding, the ALJ specifically discussed, among other things, whether Plaintiff's severe mental impairments (major depressive disorder, generalized anxiety disorder, PTSD, and ADHD), considered singly or in combination, met or medically equaled Listings 12.04, 12.06, or 12.15. R. 280–81. In considering the paragraph B criteria under those Listings, the ALJ found that Plaintiff was only mildly limited in his ability to understand, remember, or apply information. R. 280 (noting, *inter alia*, that objective clinical findings on mental status examinations showed that he "exhibited intact memory, recall and judgment"). The ALJ also found that Plaintiff was moderately limited in interacting with others and in concentrating, persisting or maintaining pace. R. 281.  *Id.* The ALJ further found that that Plaintiff had "a moderate limitation in adapting or managing himself based on evidence of effective psychiatric treatment as well as his ability to manage his mood and self-care needs." *Id.* In so concluding, the ALJ specifically acknowledged, *inter alia*, Plaintiff's complaints that "he experiences anxiety, depression, panic attacks, flashbacks, and intrusive thoughts of trauma," *id*. (citing Ex. 8E, 6F, 21F, 22F, 23F, and 28F), as well as Plaintiff's reports that his mood improves with psychiatric treatment and that objective clinical findings revealed Plaintiff had euthymic and improved mood and appropriate appearance. *Id*. (citing Exs. 6F, 10F, 11F, 21F, 22F, 23F, 28F, and 34F). At step four, the ALJ

8

found that Plaintiff had the RFC to perform medium work, subject to various exertional and non-exertional limitations. R. 282–89. The ALJ also found that this RFC did not permit the performance of Plaintiff's past relevant work as a landscape laborer and an animal attendant. R. 288-89.

At step five, the ALJ found that a significant number of jobs, including approximately 105,000 positions nationally as a dish washer, 75,000 positions nationally as a hand packer, 60,000 positions nationally as a hospital cleaner, 140,000 positions nationally as a merchandise marker, 120,000 positions nationally as a routing clerk, and 17,000 positions nationally as a mailroom clerk, existed in the national economy and could be performed by an individual with Plaintiff's vocational profile and RFC. R. 289-90. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from December 10, 2021, his alleged onset date, through the date of the decision. R. 290.

Plaintiff disagrees with the ALJ's findings at steps four and five, and asks that the decision of the Commissioner be reversed and remanded for further proceedings with directions to consider Plaintiff's need for an emotional support animal ("ESA"). *Plaintiff's Brief* ("*Pl.'s Br.*"), ECF No. 14; *Plaintiff's Reply Brief* ("*Pl.'s Reply*"), ECF No. 17. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief*, ECF No. 16.

## IV.    DISCUSSION

Plaintiff challenges the ALJ's RFC, arguing that it failed to account for the "total limiting effects," 20 C.F.R. § 404.1545(e), of the Plaintiff's impairments, and specifically, the failure to

consider the vocational expert's testimony regarding the vocational impact of Plaintiff's need for an emotional support animal. *Pl.'s Br.* pp. 4-5.

### A. The ALJ's Review of the Record

A claimant's RFC is the most that the claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). At the administrative hearing stage, it is the ALJ who is charged with determining the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). However, the ALJ need include only "credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to choose whether to include "a limitation [that] is supported by medical evidence, but is opposed by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible").

Here, the ALJ found that Plaintiff could perform medium work subject to certain additional limitations:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can lift and/or carry 50 pounds occasionally and 25 pounds frequently as well as sit, stand, and/or walk for 6 hours each in an 8-hour workday. He must avoid concentrated exposure to machinery with moving part[s]. He can understand, remember, and apply simple and detailed[], but not complex instructions. He can complete simple tasks over 2 hour intervals with normal pace. He can tolerate occasionally contact with the general public and co-

10

workers. He cannot perform team or tandem work. He can tolerate minor and infrequent changes in work routine.

R. 282.

Prior to reaching this determination, the ALJ conducted an administrative hearing at which Plaintiff and a vocational expert appeared and testified. R. 298–351. Among other issues, they both testified regarding emotional support animals. *Id*. Plaintiff testified that he was attacked by a dog in 2019 and sustained multiple injuries to his right shoulder, both legs, arms, hands, and his left testicle, requiring several surgeries. R. 309, 322–26. Plaintiff testified that he suffers from PTSD following the dog attack. R. 332.[4] The ALJ asked Plaintiff about his ESA after this attack:

> Q:      . . . . You've got a support animal now, it's not a Pit dog, I assume, but it's still a dog. And so is being exposed to a friendly dog helping you at all to deal with the dog attack?
>
> A:      Not [sic] it doesn't help me with the dog attack, but she helps me when I start having PTSD moments and when I start to have anxiety and my blood pressure raises, she indicates she lay [sic] on my chest, and she helps calm me down. She helps keep me company and she keeps guard of me when I'm outside. Because when I see other dogs, I freak out.
>
> Q:      Okay. Let's see. So do you take this dog for a walk? Or do you live in a place where, you know, you've got an enclosed yard, and you can just let her out? Do you go to any dog parks in the area?
>
> A:      I do not. I am incapable of taking her to dog parks or anything like that. When I take her out to go to the bathroom, it is on my parents' property only and the backyard is lined with the fence. So even though it is, and I can just let her loose. I don't, because I understand that she could get loose, and I need this dog to survive.
>
> Q:      So there are no walking trails in your area where you could take the dog out into the woods or you know, any forested areas nearby that you could drive to?
>
> A:      There are, but I would not be able to handle that mentally right now.

---

[4] Plaintiff also suffers PTSD resulting from rape. R. 332, 3533.

11

Q:      Okay. Because of the potential for there being other people with their dogs?

A:      Correct.

Q:      Okay.

A:      And not everybody keeps their dog at leash. And I mean, I can't handle that.

Q:      Okay. Let's see here. So this person who wrote you a letter last year for the – to approve your dog for support dog, emotional support dog. Who was that again?

A:      Dr. Kumrani [sic] [Devendra Kurani, M.D.].

Q:      Okay. And again, we have no idea who that is. Where did you see that doctor?

A:      He's my current psychiatrist.

R. 337–38. Plaintiff testified further about his ESA, including paperwork related to that animal:

A:      . . . . So then I decided to give everything back to Dr. Kumrani [sic] because at the time he was switching locations. And again when these people write letters for your dog, they go off of what your therapists and what you psychiatrists say.
        So Ms. Neely {PHONETIC} [sic] [Kenya Nelson, LPC], who was the most recent one, we had a one-hour session, very similar to what we're doing here. And she went off of all of the other psychiatrist notes, therapy notes and everything else and asked me some very serious and very down-to-earth questions and she agreed I need an emotional service animal.

Q:      Right. So she actually had access to the other doctor's notes?[5]

A:      That's correct. That the only way that they can write notes.

R. 339–40.

Q:      So how did you find this therapist out in Texas?

---

[5] The Court notes that the administrative record contains treatment notes from Dr. Kurani dated June 1, 2023, to September 13, 2023. R. 3533–39 (Exhibit 34F). It is not apparent from the record whether Ms. Nelson reviewed any of these specific treatment notes from Dr. Kurani—or other notes not included in the administrative record—before she authored her letters dated August 21, 2023, R. 3531–32 (Exhibit 33F). These notes included in the administrative record do not include a specific prescription for an ESA in the context of a work setting (or, indeed, any prescription for an ESA).

A:      The – in order to renew what I need to, for the travel part of my emotional support animal, you have to redo that every year. And when I went back to the same people I went to, she was the person that they put me in contact with.

Q:      Okay. So you said this is a renewal. When was the first time you got any kind of confirmation of a support animal?

A:      That would've been last year. And that's again, she gave one letter that's current, and that always stays with you. That means you're allowed to have for housing or renting, but then there's a secondary letter that needs to be done every year.
          Meaning for travel, if I'm going to stop at a hotel or motel, or if I do any kind of traveling, which I never do, but I always have to have all paperwork at all times signed by the correct people.

Q:      I see. Okay. So at Exhibit 33F [R. 3531–32] there are two letters. And again, the one that's on top on Page 1 has a specific period of time, August 21 of '23 to August 21 of '24. And that's the one that regards air travel and activity. And then the one on Page 2 is just related to housing.
          And so that does not have any time period that's listed. That's all new information for me. Thank you for pointing that out. So last year in 2022, when you got your dog, you have a similar letter which also just refers to housing?

A:      Yes.

Q:      Oh, okay. All right. And who was that provided by?

A:      That was provided by Dr. Tom Dwyer, and that is a [sic] actual psychiatrist that I was seeing at the time. And he was the one that I also see now and is still my current psychiatrist.

R. 304–05.

The ALJ went on to question a vocational expert. R. 340–49. The ALJ posed a hypothetical question to the vocational expert that assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 282, 342. The vocational expert responded that while Plaintiff's past work could not be performed, the jobs of dish washer, hand packer, and hospital cleaner would be appropriate for the hypothetical claimant. R. 343.[6] Counsel for Plaintiff asked

---

[6] The ALJ subsequently posed an alternative hypothetical that assumed a RFC for light work with additional non-exertional limitations not that were not included in the RFC ultimately

13

the vocational expert whether any of the jobs provided would change if the hypothetical worker

had to have an emotional support animal nearby. R. 348.  The expert's response was:

> In my experience, I would say generally, no.  And again, this is certainly based on my experience. Excuse me, I take that back.  It would be employer specific.  So I would say that just based in the context of competitive labor, typically there would be a request, especially for the unskilled labor that I provided, there would probably be a request for some type of accommodation to be able to bring a support animal into the workplace.

R. 349.  The ALJ then engaged in the following exchange with the vocational expert:

> Q:    All right. And again, when I'm looking at the jobs that we're talking about, hospital cleaner, packager, dishwasher [sic] it would be unusual for somebody to have a dog in that environment, right?
>
> A:    That's correct, Your Honor.
>
> Q:    Okay. All right. Maybe more common in an office context, but certainly not if you're going to be going into patient's [sic] rooms and cleaning in various common areas or anything like that, that probably would not be appropriate.
>
> A:    So I haven't seen anywhere even with an accommodation request, typically employers will mention it may be putting undue hardship on them for that just based on the nature of the work. So, yes, that's correct, Your Honor.

*Id*.

 In her written decision,  the ALJ considered Plaintiff's hearing testimony and noted that:

> The claimant testified that he has difficulty paying attention, focusing, and following directions.  He alleged that he experiences constant and recurrent thoughts of past trauma.  The claimant explained that he takes Xanax for his panic attacks and traumatic thoughts.  He testified that he has difficulty with remembering generally. . . . He also has difficulty getting along with others and socializing because of his anxiety and anger.

---

adopted by the ALJ (assembly line production pace work; no work in the vicinity of the general public; and brief superficial interaction with co-workers). R. 343–46 (reflecting the vocational expert testimony that the hypothetical worker could perform the jobs of merchandise marker, routing clerk, and mailroom clerk).

14

R. 283.  The ALJ also reviewed Plaintiff's course of psychiatric treatment, referencing his complaints to his treating therapist from July 21, 2022 to March 31, 2023, of poor sleep, low mood, and anxiousness, but noted that the therapist found Plaintiff "oriented and exhibited an appropriate affect and goal directed thoughts." R. 285.  From August 22, 2022 to December 13, 2022, Plaintiff complained to a treating nurse practitioner of "difficulty with focus, lack of motivation, loss of energy, racing thoughts, anxiety and excessive worry," with improved mood with Trileptal compliance. R. 285-86. The ALJ observed that although the nurse practitioner noted that Plaintiff "presented as anxious, depressed, and exhibited a constricted affect," he also presented with appropriate appearance, exhibited good insight and normal speech." R. 286.  The ALJ noted that a state agency reviewing psychologist opined on November 8, 2022, that Plaintiff had "moderate limitations in concentrating, persisting or maintaining pace as well as mild limitations in understanding, remembering, or applying himself [sic], interacting with others, and adapting or managing himself." *Id.* From June 1, 2023 to September 13, 2023, Plaintiff complained to Dr. Kurani, his treating psychiatrist, of PTSD symptoms. R. 286. However, Plaintiff reported stabilized mood with Xanax compliance and Dr. Kurani observed that Plaintiff presented as casually dressed, calm, cooperative, and exhibited a normal mood and an organized thought process. *Id.* (citing Exhibit 34F; R. 3533–39).

The ALJ also specifically considered evidence relating to Plaintiff's ESA:

On August 21, 2023, Kenya Nelson, LPC, a treating therapist, determined that the claimant met all of the elements for a diagnosis of a mental health disorder as defined in the Diagnostic Statistical Manual Fifth Edition. Furthermore, Ms. Nelson opined that the claimant's psychological condition is disabling insofar as it significantly limits at least one daily life activity. Ms. Nelson strongly concurred

regarding a recommendation that the claimant be permitted an Emotional Support Animal (ESA) (Exhibit 33F [R. 3531–32][7]).

R. 286. However, the ALJ found "Ms. Nelson's opinion that the claimant had a disabling psychological condition (Exhibit 33F) unpersuasive because it addresses the ultimate issue of disability, which is reserved for the Commissioner." R. 288.

## B.      Need for An Emotional Support Animal

It is well established that in order for a claimant to be found not disabled, he must be able to perform a given job without an accommodation. *See Cleveland v. Policy Mgmt. Sys. Corp.* 526 U.S. 795, 803 (1999)) ("[W]hen the SSA determines whether an individual is disabled for SSDI

---

[7] In a letter addressed "To Whom It May Concern" and dated August 21, 2023, Ms. Nelson advised that Plaintiff's psychological condition entitled Plaintiff's ESA to accompany him on air travel:

> We are submitting this letter on behalf of the above referenced client, Mr. Z[.], following screening and assessment, most recently conducted on August 21, 2023. This letter confirms the finding as of above date that Mr. Z[.] meets all of the elements for a diagnosis of a mental health disorder as defined in the Diagnostic Statistical Manual Fifth Edition (DSM-5). Pursuant to the foregoing diagnosis, his psychological condition is disabling insofar as it significantly limits at least one daily life activity. It can affect his ability to cope and the maintenance of his psychological stability.

> Based on the above, I strongly concur in the recommendation that he be permitted an Emotional Support Animal (ESA), which entitled him to the rights and benefits provided by the Air Carriers Act, 49 U.S.C. § 41705 and Dept. of Transportation 14 C.F.R. Part 382. These laws define a person with a mental health diagnosis, which affects their daily functioning significantly, as a disability. This gives him the ability to be accompanied by his Emotional Support Animal for air travel.

> If further information is requested, please provide us with a written, signed authorization to provide such information from Mr. Z[.] Thank you in advance for your cooperation.

R. 3531 (reflecting that such letter covers a period of August 21, 2023, through August 21, 2024). Ms. Nelson authored a second letter on the same date with most of the exact language except that it addressed Plaintiff's ability to bring his ESA to housing facilities pursuant to the Fair Housing Amendments of 1988. R. 3532.

purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.") (emphasis in the original); *see also* SSR 11-2p (Sept. 12, 2011) ("When we determine whether a person can do other work that exists in significant numbers in the national economy, we do not consider whether he or she could do so with accommodations, even if an employer would be required to provide reasonable accommodations under the Americans with Disabilities Act of 1990."); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 95 (3d Cir. 2007) (providing that an ALJ "is not entitled to consider potential accommodation by employers in determining the availability of jobs in the national economy that [a claimant] can perform") (citing *Cleveland*, 526 U.S. at 803).

The parties have pointed to no authority from the Court of Appeals for the Third Circuit establishing a standard for when an ALJ must include an emotional support animal in the RFC, and this Court is unaware of any. In the absence of such authority, this Court notes that "other courts have found that the use of a service dog must be medically necessary to be considered in an RFC assessment." *McGehee v. Berryhill*, 386 F. Supp. 3d 80, 87 (D. Mass. 2019) (collecting cases); *see also Cordell v. Saul,* No.: 3:19 CV 47, 2019 WL 6257994, at *18 (N.D. W. Va. Nov. 4, 2019) (same), *report and recommendation adopted sub nom. Cordell v. Comm'r of Soc. Sec.*, No. 3:19-CV-47, 2019 WL 6255498 (N.D.W. Va. Nov. 22, 2019). Some courts employing a medical necessity test require the ALJ to consider a claimant's use of a service dog "when there is evidence of a prescription from a medical provider for the dog." *McGehee*, 386 F. Supp. 3d at 87–88 (citations omitted). Notably, "a letter from a medical provider that suggests an individual's use of a service dog, without further testimony or documentation of the individual's

17

need and use of the service animal, is insufficient to establish that the service dog is medically necessary." *Cordell*, 2019 WL 6257994, at *18 (citations omitted).

At least one court in this circuit has found that an ALJ's failure to address a claimant's emotional support animal in a decision was "immaterial" where that claimant provided no evidence that the animal was "medically necessary." *Rentz v. Bisignano*, No. CV 24-1293, 2025 WL 2522379, at *1 n.1 (W.D. Pa. Sept. 2, 2025) ("That the ALJ did not address [the claimant's] emotional support cat in his decision is immaterial where [the claimant] has merely pointed to evidence showing that Dr. Reinthaler provided support for [the claimant's] keeping a cat in his residence and there is no other evidence that would show [the claimant's] cat was 'medically necessary.'"). Similarly, other courts have found that even if it is error for the ALJ to fail to discuss a service animal, that error is harmless if a claimant "did not meet his burden to show that the service animal was medically necessary." *Benjamin C. v. Comm'r of Soc. Sec.*, No. 5:21-CV-872, 2022 WL 16571699, at *11 (N.D.N.Y. Nov. 1, 2022); *see also Natividad S. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01507, 2022 WL 2718511, at *4 (W.D.N.Y. July 13, 2022) ("The Court acknowledges that the ALJ may not have addressed or considered the dog, but ultimately, this error is harmless because there is insufficient evidence that the dog is medically necessary.") (citations omitted); *cf. McGehee*, 386 F. Supp. 3d at 88 ("[A]lthough the ALJ's treatment of [the claimant's] service dog was not exhaustive, her failure to address this issue in the RFC assessment was not material because [the claimant] failed to provide sufficient evidence that her dog was medically necessary.").

Additionally, this Court has previously considered evidence of an ESA's lack of training as a service dog when determining whether the ALJ erred in failing to include an animal limitation in the RFC. In *Pfleger v. Commissioner of Social Security*, No. 20-cv-10757, 2022 WL

18

577967, at *7(D. N.J. 2022), the plaintiff challenged the ALJ's failure to consider that he needed his dog for comfort whenever he left home, including at any potential workplace.  Arguing that the vocational expert presented no studies showing that plaintiff could bring his animal with him to the employment opportunities cited by the expert, plaintiff sought remand of the ALJ's decision.  *Id.* This Court disagreed, noting that although his doctor stated that the plaintiff "require[d] the use of a service animal," there was no evidence in the record to show that the dog, "Bob," was a "service animal" trained to assist plaintiff in any way. *Id.*  Indeed, the Court noted that plaintiff admitted that his dog had no special professional training. *Id.*  In reviewing the RFC, the Court concluded that the ALJ had appropriately weighed the evidence and found that the plaintiff did not have a service animal and therefore did not consider plaintiff's stated need for an ESA in the RFC.  The Court further found that the inability of the vocational expert to state whether any of the suggested jobs could be performed with a service animal was "immaterial." *Id.*

In the present case, Plaintiff argues that "there is no material dispute regarding Plaintiff's need for an ESA, or its vocational impact." *Pl.'s Br.* at p. 8 (citing R. 304, 338 (reflecting his hearing testimony)). He points out that the ALJ "acknowledges without critique that Plaintiff was *recommended* an ESA[.]" *Id.* (citing R. 286) (emphasis added). Plaintiff also highlights the vocational expert's testimony responding to various hypotheticals involving ESAs, which Plaintiff contends the ALJ "ignor[ed.]" *Id.* at 9–10 (citing R. 289–90, 346, 348–49). Plaintiff contends that the ALJ's failure to analyze this evidence "is clear error." *Id.* at 10.

In support of his position, Plaintiff cites numerous cases where courts have remanded for further proceedings when the ALJ ignored the vocational effects of the claimant's need for a service animal. *Pl. Br.* at pp. 6-7 (citing cases).  He argues that the case "most directly on point,"

19

*Bryan H. v. Kijakazi*, No. 19-cv-2244, 2022 WL 2967423, at *3 (N.D. Ill. July 27, 2022), was remanded because the ALJ failed to address the fact that two treating physicians prescribed an ESA for the claimant, a third found the claimant had marked limitations because of his reliance on a service animal, and the vocational expert testified that a service animal would typically not be allowed in sorter, hand packer or assembler jobs – jobs specifically referenced by the vocational expert in testifying about available jobs for Plaintiff in this case. *See Pl.'s Br.* at 6. In remanding the case for further proceedings, the court in *Bryan H.* explained that "[n]owhere in her opinion does the ALJ address the fact that two treating physicians prescribed a service animal for Claimant and a third treating physician concluded that Claimant had marked limitations because he relied on a service animal and medication to function." 2022 WL 2967423, at *3. The court further noted that the ALJ did not address the VE's testimony that use of a service animal was an accommodation that would "typically not be allowed" in the sorter, hand packer, and assembler jobs, and failed to discuss whether, or how, given the claimant's need for a service animal, Claimant would able to work despite his reliance on his service dog. *Id.* (citing *Strain v. Berryhill*, No. 3:17-cv-365, 2018 WL 4347335, at *4 (N.D. Ind. Sept. 12, 2018) (remanding when "the ALJ never bothered to explain whether she credited [the claimant's] asserted need to be accompanied by his service dog")). Plaintiff has not persuaded the Court that this issue requires remand.

In the instant case, Plaintiff is correct that the ALJ did not directly address the question of whether an ESA was "medically necessary." However, this case is clearly distinguishable on its facts from *Bryan H.* Unlike *Bryan H.,* where two physicians prescribed the use of a service dog and a third discussed limitations related to the need for a dog, here, as detailed above, the record evidence is limited to Plaintiff's own testimony as to need and a letter requesting an

accommodation to bring Plaintiff's dog on board a plane. R. 304–05, 337–40, 3531–32. Plaintiff argues that he testified that he needs his ESA for accommodations in housing or renting and whenever he travels to stay in hotels; that the dog helps him when he has PTSD moments with anxiety and raised blood pressure, and that the dog guards him from other dogs. *Pl.'s Br.* p. 8 (citing R. 304, 337). Plaintiff also claims that he lets the dog out in his parents' backyard but "is incapable of taking the dog to a dog park or other public place . . .because 'I need this dog to survive.'" *Id.*; R. 338. Plaintiff argues that although the ALJ "acknowledg[ed]" Plaintiff's testimony as to his need for an ESA and his "prescription for an ESA," the ALJ failed to comment further and ignored the vocational expert's testimony that the need for an ESA would preclude Plaintiff from obtaining certain work. *Id.* p. 10.

Plaintiff mischaracterizes the record when he argues that he had a "prescription" for an ESA. *Id.* Plaintiff relies on Ms. Nelson's August 21, 2023 letters, detailed above and referenced by the ALJ. R. 286 (citing Ex. 33F, R. 3531–32). Rather than constituting an overall "prescription" for an ESA or providing any insight into the necessity of an ESA at work, the letters merely request an accommodation that would permit Plaintiff to travel on a plane with his dog and secure housing with his dog. R. 3531–32. The air travel letter more specifically states:

> Based on the above, I strongly concur in the *recommendation* that he be permitted an Emotional Support Animal (ESA) as a reasonable accommodation to alleviate symptoms and effects of disability, address his psychological adjustment, and thereby support his functional living activities and ameliorate the severity of his symptoms for air travel and activity at his destination.

R. 3531 (emphasis added); *see also* R. 3532 (providing the same language, including that she concurs in the "recommendation" except explaining that the letter was to "support his functional living activities and ameliorate the severity of his symptoms in housing"). The air travel letter further "confirms *the patient's representation* that his dog, Sugar, (a American Staffordshire), is

21

an appropriate Emotional Support Animal (ESA), which entitles him to the rights and benefits provided by the Air Carrier Access Act, 49 U.S.C. § 41705 and Dept. of Transportation, 14 C.F.R. Part 382." R. 3531 (emphasis added); *see also* R. 3532 (same except for stating the letter "entitles him to the rights and benefits provided by the Fair Housing Amendments of 1988"). At bottom, both Plaintiff and Ms. Nelson describe these letters as simply a "recommendation," apparently based on Plaintiff's "representation," and do not constitute a "prescription" for a ESA. R. 3531–32; *see also Pl.'s Br.* p. 8 (stating that "Plaintiff was recommended an ESA" when referring to Ms. Nelson's letters); *Pl.'s Reply* p. 4 (referring to Ms. Nelson's letters and stating that "the ALJ acknowledged without critique that he had been recommended to utilize an ESA").

Notably, other courts have found similar letters to be an insufficient basis for remand. In *Early v. Kijakazi*, No. 5:21-CV-00096-KDB, 2022 WL 2057467, at *5 (W.D.N.C. June 7, 2022) *aff'd sub nom. Rush v. Kijakazi*, 65 F.4th 114 (4th Cir. 2023), the court considered a letter similar to the one at issue here and found "the ALJ committed no reversible error for allegedly failing to thoroughly consider the Plaintiff's need for an emotional support animal." *Id*. The court explained that the "only record evidence that the Plaintiff required an emotional support animal is a letter stating she needed one to travel on an aircraft. . . . The letter covered a one-year period from 2017 to 2018. . . . The letter makes no mention of any need for a support animal in a work-related setting. . . ." *Id*. In the absence of any evidence demonstrating medical necessity in an employment setting, the ALJ's decision not to consider an ESA was not error in the present case. *See also Ashley D. v. Comm'r of Soc. Sec*., No. CV 22-11344, 2023 WL 5266849, at *10 (E.D. Mich. July 17, 2023) ("Plaintiff herself characterizes Dr. Cousineau's letter as a mere 'recommendation,' not a prescription, and such letter does not establish an actual medical

22

necessity. . . . Nor does Dr. Cousineau's letter indicate how the use of an emotional support dog would bear on Plaintiff's ability to work.") (citations omitted), *report and recommendation adopted*, No. CV 22-11344, 2023 WL 5251849 (E.D. Mich. Aug. 15, 2023); *Horne v. Saul*, No. 2:19-CV-013-DCP, 2020 WL 1547068, at *12 (E.D. Tenn. Mar. 31, 2020) ("[T]he Court finds that Plaintiff has failed to establish that a service animal was medically necessary. The referenced letter to Plaintiff's apartment complex that he requires a service animal does not detail that such an animal was medically prescribed or provide an opinion on the impact of a service animal on Plaintiff's ability to work.").

In arguing that the ALJ erred in failing to consider Plaintiff's ESA when crafting the RFC, Plaintiff has not pointed to—nor is the Court aware of—any evidence in the doctors' notes and other medical records reflecting a prescription for an ESA or a determination that an ESA was medically necessary. The ALJ's review of the record evidence demonstrates that nowhere in the record is there any other mention of Plaintiff being prescribed an ESA, or even a discussion of Plaintiff's need for a service animal to assist Plaintiff in any of the tasks of daily living, apart from Plaintiff's own stated representations.  Indeed, apart from his own testimony and Ms. Nelson's letters, which seeks an accommodation to allow Plaintiff to bring his dog, Sugar, on board a plane when he travels and to accompany Plaintiff in housing, Plaintiff has pointed to no evidence whatsoever establishing his need for an ESA. Unlike *Bryan H.*, where two treating physicians prescribed a service dog, here the only mention refers to the dog as an "accommodation," and not a medical necessity. Based on this record where there is no evidence that an ESA was medically necessary, the ALJ's failure to expressly discuss Plaintiff's purported need for an ESA when crafting the RFC is immaterial. *Rentz*, 2025 WL 2522379, at *1 n.1; *cf. McGehee*, 386 F. Supp. 3d at 88. However, even if the ALJ's failure in this regard is error, any

23

such error is harmless where Plaintiff did not meet his burden in showing that his ESA was medically necessary. *See Benjamin C.*, 2022 WL 16571699, at \*11; *Natividad S.*, 2022 WL 2718511, at \*4.

Moreover, apart from the absence of any specific prescription or order with regard to Plaintiff needing a service dog other than for travel purposes, there is no evidence in the record to indicate that Sugar is a "service animal," with specific training or qualifications to assist Plaintiff.  *See Pfleger,* 2022 WL 577967, at \*7.

In the absence of a showing by Plaintiff that an ESA was medically necessary, or that his ESA received any special training,  the ALJ was not required to address the testimony of the vocational expert who explained that whether a support animal would be permitted in the workplace was an "employer specific accommodation."

For all these reasons, the Court finds that the ALJ's failure to discuss Plaintiff's purported need for an ESA when fashioning the RFC does not serve as a basis to remand this action.

## V.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date:  May 8, 2026

*s/Cheryl L. Pollak*
CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

24